Good morning, and may it please the Court. My name is Keith Patton, and I represent Natalie Konrick. Also with me is Eric Williams and David Beluk, who have helped to have worked on this case as well. This case should be, I say should be, focused on methodology. The proponent of expert testimony must prove by a preponderance of the evidence that the testimony is relevant and reliable. You have to show the experts are qualified and that their methodology is valid. The question is not, it is not whether the Court finds one set of experts more persuasive than the other. It is whether that fact or whether a trier of fact should be permitted to make that choice. The ultimate conclusions and the bulk of the criticisms by the district judge in this case focus on cross-examination areas. They focus on issues that are primarily related to specific and not general causation. The district court did not appropriately focus on the principles and methods of our experts. Instead, it reached its own conclusions from the scientific studies in excluding three highly qualified doctors with a combined 100 years of experience. But you know, one thing about your brief that seemed to me you did not take the district court on. You did not really challenge the district court except in broad generalities. The district court dealt excessively in specifics that you seem to disregard. What we focused in on our brief, Your Honor, was to focus back on the methodology. The district court's opinion is replete with cross-examination subjects. The way that expert reports and then ultimately expert depositions occurred these days in toxic tort cases is the defense counsel will go through each study the expert relies on and show some of the weaknesses, show some of the negative points, disregard some of the positive points, and that's a cross-examination. The district court in this opinion largely adopted or mirrors the exact points that the defense was making, and that's where the abuse of discretion, that's where the clear mistake is. If a plaintiff's expert has relied on 10 studies, all of which failed to address the relevant matter, then the fact that there's 10 of them doesn't suddenly make it now a matter for the jury. I mean, there's still a gatekeeper. The whole idea of the gatekeeper is that juries get impressed with somebody having a big title, a big degree, and all of that, and so we want to be sure that the person has met some basic criteria before putting them in front of a jury. So relying on a bunch of studies that are themselves either not about this particular chemical or not reliable doesn't transform this into a credibility issue. It's still part of the gatekeeping function, no matter how many studies there are. So I think the district court did exactly what the court's supposed to do, which is go through the studies itself and say, do they support the theory here? I understand and respect your point, but here the 29 studies that were focused on by these experts deal with organic solvents, including and especially benzene. But not focusing in on our solvents. Organic solvents are what Natalie Connick was exposed to throughout her pregnancy, working 50 yards from the docks where in the month of February 2013, 800,000 gallons of crude were discharged. In March, 1.4 million. There are mushrooms that are poisonous and there are mushrooms that aren't. So if you say, well, we've done studies on mushrooms and they can kill you, that doesn't answer the question. The focus here by the experts was the exposures at issue and in question. She was exposed without a doubt to organic solvents in the course of her work. Her injury, the adverse fetal outcome, was the death of her child. Specific organic toxic substances. There are focuses on specific organic solvents. Those were benzene. The triggering event here around April 3rd and April 4th was a large release of benzene, above and beyond the chronic exposure she had during her eight weeks. And that's why a lot of the testimony in this case focuses on benzene. A lot of it doesn't. A lot of the evidence in this case also focuses on toluene because the evidence, and we had a meteorologist opine as to the continuous and systematic exposures Natalie would have had working 50 yards from the docks to those two precise chemicals, along with the broader category. Additionally, organic solvents as a category are what have been studied throughout the literature. The experts must rely on what is published in the literature. Yes, but only if it's relevant and reliable, et cetera, et cetera. And the problem in these chemical type cases is isolating the relationship between the particular chemical to which the person was exposed and the resulting problem. I mean, the resulting event that is being complained of. Here, a very, very tragic event, no doubt. Sure. And we address that. And we address that with an exposure expert to identify specifically what she was being exposed to. Let's look at two of this court, the Fifth Circuit's key decisions. Kumho-Tyrer, and it's also discussed in Pipitone. And Judge Jolly, you were on Pipitone. The lack of literature on a particular subject may not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review for the particular application at issue may never have previously interested any scientist. For some reason, we don't have a wealth of studies of pregnant women working in refineries monitored for precise exposures. And the reason is, in this country, pregnant women normally don't work in refineries. The other point is, and the reference manual covers for this. But the lack of a study dealing with your specific organic solvent doesn't entitle you to use a study and base an opinion on it that doesn't have to do with that specific organic solvent. Isn't that right? I mean, what I'm saying is we can agree with you that there is a dearth of studies. But that doesn't bridge the gap and say, okay, because there aren't studies that deal with this one specifically, you get to use whatever else is out there. Every study cited by our experts deals with organic solvents or more specific solvents within that category. There are statistically significant findings above 2.0 for toluene and for benzene throughout the literature cited by our experts. And that point is lost in the district court's opinion because she's focusing on the cross-examination points. I also wanted to point out that the reference manual indicates you in response to the judges focusing on cross-examination points respond in kind. And that's where I think we get ahead of the inquiry. The inquiry should be on methodology. And experts disagree. The real disagreement in this case is whether or not Ms. Conrick's fetus suffered or died from an infection or whether it was from the chemical exposure. That's really the battle of the experts that takes place here. The methodology is... I mean, there are idiopathic stillbirths, too. And that is accounted for... The problem is you're saying if we can rule out an infection, then we've proven that this particular solvent caused it. And I'm sorry. I mean, unfortunately. And, again, this is a very, very tragic case, and there's no question about that. But that doesn't make these people liable for it. The question you pose, again, going back to differential diagnosis as an accepted methodology, as the gatekeeper if you have a dispute of whether it's chemicals, infection, or de novo unknown causes, which, by the way, everything besides asbestos and mesothelioma is going to have a de novo type of factor. But once you get past that, that's the differential diagnosis application. And one expert might say, as ours do, the chemical side, the defense experts, the infection side. And that's where the battle has been, and that's where the battle should be with a jury. But coming back to methodology. When that gets to specific causation, you first have to show that this solvent to which he was exposed, more likely than not can cause these kinds of results. That's fair. And that is shown by the defendant's own documents which speak to it, and it is shown by their own testimony that recognizes it, and it's shown by the autopsy. Before this case made its way into the courthouse, the medical examiner at the University of Alabama, with 21 years of experience, described the mechanism of action, described how this baby died. And she also cited the articles significant to the issue of toxic exposure to benzene and solvents in the workplace, and not only the death, but also the type of congenital malformations exhibited by this child. Very low birth weight, microcephaly, small brain. And that's the aspect that was glazed over by the trial judge. If you were to accept, if this court were to accept and ignore the findings of an autopsy, ignore the findings of a treating doctor, you open the door to re-question other findings that have already been made or that would be made by clinicians in their practice. And Pipitone, I think Pipitone is very instructive, and I don't say that, Your Honor, just because you were on the decision, but it stood out the most to me. Pipitone shows the basic application or basic handling of how these cases should be recognized. In Pipitone, this court found that the district court abused its discretion in excluding the testimony of the doctor. The court, this court, evaluated the doctor's testimony under Daubert and found it admissible, noting extensive experience treating infectious diseases, his academic appointment in the University's Department of Infectious Disease, and his publications in the area. Okay? Dr. Barer is the neonatologist, 30 years of experience, published in this area, over 60 publications, including a book chapter. Her methodology of differential diagnosis, her methodology of applying basic medicine and evaluating the situation should be admissible. The district court is correct in saying that a lot of these generalities with respect to toxic substances and how they affect individuals in the situation of the plaintiffs are not applicable here, and the expert did not try to explain away the inapplicability of these studies, so as to focus on your particular situation. I mean, you left these broad studies out there unanswered as to how they might specifically apply to your case. You didn't cut away the fluff to get down to the meat. We did cut away the fluff. We pointed out the statistically significant findings within each study. They're in our brief. They're included as an extra chart in the appendix. They were part of Dr. Harrison's analysis. They were part of Dr. Harrison's report. Dr. Harrison, his methodology, and he spells it out in his report. He says the determination of general causation is a complex undertaking. It includes epidemiology, toxicology, so on and so forth. I have considered not just published epidemiological reports, but all relevant data, including the human case reports, experimental studies, mechanistic data, including unpublished studies. He says I have followed generally accepted methodology for determining causation. There is no challenge by Judge Vance that he did not cover this. Identify all relevant studies. He did that. There's a criticism that he missed one follow-up study. Read and critically evaluate all the relevant studies. There's no indication he did not do that. Evaluate all the data based upon recognized scientific factors, Bradford Hill, and other factors relevant to the chemical and the disease of the injury. Number four, exercise best professional judgment. He exercises judgment based on 35 years of experience. He's board certified in occupational medicine. And number five, explain the factual basis and reasoning supporting his conclusion. He recognizes the broader category of organic solvents, and he recognizes the more specific category of benzene. Again, the presence of studies that cut against the expert's opinion and that are not accounted for the expert is a subject for cross-examination and not a barrier to admissibility. That's in the reference manual. Turning a little bit to Dr. Waters. Dr. Waters has 30-plus years in medicine. She teaches pathology, pediatrics, obstetrics and gynecology, and emergency medicine. She's board certified in four different areas, one of which is pediatric pathology. There are only about 400 people board certified in that area. One of the main areas of Bradford Hill is mechanism. How did this injury happen? How do you get from a certain type of exposure to a certain type of adverse result? And Dr. Waters explains that. There were increased nucleated red cells indicating a stress, such as decreased oxygen or toxic exposure. She describes how the lack of oxygen led to this ultimate fetal demise. She noted that benzene, other organic solvents, also hydrogen sulfide, are known toxicants to fetuses and interfere with fetal oxygen uptake needed for healthy development. She confirms and reclarifies what the pathologist said. We hired Dr. Waters to be the voice of the pathologist to explain how this type of injury happens. Her methodology is medical observation and differential diagnosis. She also cites studies, statistically significant findings, relating to the exact type of problem we have here. I understand that upon reading Judge Vance's opinion, there is an overwhelming page after page after page. This study says this, this study also says that. It goes back to what happens in cross-examination. Expert depositions, they show up with their box, whereas here you get a disk a couple days early, and as a lawyer in these cases, you can go through and pick apart your points for the cross. That's all Judge Vance does here. What's wrong with that? It doesn't go to the methodology. The methodology is the reliance upon the whole body of literature and the application of professional judgment. She starts with that premise of the methodology. I mean, in her opinion, then she begins to take it on point by point and comes down to the conclusion that she does, and then you don't really address the weaknesses that she points out. We do address them, Your Honor. My time is up here, and I'll cover in rebuttal, but we do address throughout Dr. Harrison's opinions, as recited in the reports, the statistically significant positive findings. They are covered. Thank you. Thank you, sir. Mr. Beuthin. May it please the Court, Counsel. Ty Butow. I'm here with Louie Larison and Heather Hewitt, who also worked on the briefing in this matter. We know from Rule 702 and from Daubert and from Joiner and from this Court's writings in Knight and a series of cases thereafter that the district court has broad discretion to determine whether a body of evidence is sufficient to support an expert's opinion. We know from Daubert and Joiner, et cetera, et cetera, that that gatekeeping function is one that's assigned to the district court. When thinking about what Judge Vance did in this instance, one not only can look at the 44-page opinion that truly does, in a sense, show her work. It's not a one-sentence order that says we're fine for the defendant. She shows her work. She demonstrates over and over again. What do you say specifically? I mean, his explanation is that she ignores methodology and engages in just simply a cross-examination that raises ancillary and minor points without addressing the major point of methodology. I think I'll take Dr. Harrison by way of example, Judge Jolly, to talk about the methodology. What she finds with Dr. Harrison is that Dr. Harrison cherry-picks data from studies. That's a methodological flaw, that Dr. Harrison relies on studies for which the findings are not statistically significant. The confidence interval includes one. You can't rule out that a finding might be based on chance. Therefore, that is another methodological flaw. She also finds that in some studies, and this is a core problem with this case, and this is more proof of why the district court did not commit clear error, some studies simply don't apply. That is, she used to look at reliability and relevance. They do not apply when the specific injury is different from the specific injury complained of by this plaintiff. Ms. Conrad suffered a terrible, a terrible injury. There's no dispute about that. It's a tragic set of facts. But recall what we learned from the very definition of general causation. We know from the Knight case and all the cases that have cited it since that general causation is a question of whether a substance is capable of causing a particular injury. And I want to add emphasis to that term, a particular injury. Now, the plaintiffs are engaging a little bit of a taxonomy trick here to talk about adverse fetal outcome as an injury. That's a very, very broad description. But we know, and it's set out from footnote 31 of our brief and throughout the opinions of Dr. Manning and Dr. Belmont from the defense side, we know that this particular person suffered a stillbirth at 27 weeks. And there is some evidence of some impact from exposure to benzene very early in the embryonic stage, just like Dr. Harrison's book chapter talks about. However, as Dr. Manning sets forth, and it's quoted both in the record from his report and in the footnote I mentioned, as Dr. Manning sets forth, there may be some evidence of impact early developmentally in the development of the embryonic phase, but there is really no record. There's no reliable scientific data to support a suggestion. Well, I guess the problem that I have is there is no pregnant woman who would sort of knowingly walk into a cloud of benzene. And so the problem is it seems like there is an issue here, and yet we can't quite find the right study, perhaps for the reason counsel opposite said, which is there aren't a lot of volunteers to go do a study, and it would be unethical probably to do such a study. You have to look at just empirical data, which maybe there isn't a lot of in the United States. Maybe there is in other countries. I don't know. But so then basically you can send clouds of benzene at will and never be held accountable for that. So how do you answer that concern? So I guess without engaging Judge Haynes in the concept of whether somebody is sending clouds of benzene at will, I guess the question, as I hear it from the court, is who bears the risk of the absence of evidence? Can the defendant be held liable in the absence of evidence, or can the plaintiff go to the jury? No, I'm saying that this seems this isn't that she, I don't know, she was walking along on a city street and it's just a polluted city and just kind of generally trying to sue the city for pollution. I mean, this is a rather specific chemical that seems like there is suggestion, and you even concede suggestion can have impact and seems rather obviously could have impact, and yet we're all sitting here parsing everything very finely that ends up with you getting away with it, if you will. You're a client. Well, again, not to take issue with the terminology. The point is you have to prove your case. One does have to prove one's case. But let me address the bigger concern. SLAMA, S-L-A-M-A, is a 2009 French study that the plaintiffs try to rely on, and it is as close as they get, if you listen to the district, if you read the district court's opinion, to my term, not Judge Vance's, to initiating the question. It sort of starts the question. SLAMA studied pregnant women as late as 27 weeks and found some evidence, and these are some people working in a petrochemical plant, some neighbors, et cetera, et cetera. So with all respect, Judge Haynes, there are studies that have studied late pregnancy and potential exposures to benzene, and what SLAMA found was a not statistically significant issue of birth weight and head circumference at 27 weeks and later. So with all respect, these things have been studied, and as Dr. Manning concludes in his report, there's no evidence of fetal death as a result of benzene exposure, and that is the claim being made here. No, I mean, I understand very well how evidence works and how people have to have evidence and whatever, but it does seem a little bit potentially circular here. Well, or the application. It's so dangerous, nobody's going to test it. Yes, I understand we have some of these epidemiological-type studies. I think I said empirical before I meant epidemiological, and I get that, and, you know, that's terrific, but we're not going to go study it in a controlled environment for the reason that, as I said, I hope we wouldn't get volunteers even if somebody overcame the potential epics issue. So then that should tell you something, because we will have people volunteer to drink milk versus drinking, you know, water versus drinking skill milk or something like that to test how that works. Well, Judge, I don't know. I guess in fairness, I don't know how I can fix the fact that benzene is carcinogenic, and so people don't like to study it through volunteers. That's absolutely true. But at the same time, there have been studies of pregnant women who were potentially exposed to benzene. Those studies failed to find the association that plaintiffs need. The particular link. That's your point. Your point is there may be other links, there may be other problems, there may be reasons people don't want to sit around inhaling benzene, but not this particular link. Absolutely, absolutely. Now, let me address, because I was trying to think about the very question Judge Jolly raised with counsel before. As I read the briefing to this Court, I was looking for the point where the plaintiffs identified what the clear error was. Where did she actually fail or disregard to apply controlling law? And one would have expected a message to this Court that said they skipped the Smith study or she missed the Jones study or something. They really haven't done that. And what they've tried to suggest here is basically it's just an attack on Daubert. It's just saying it's only methodology, you can't actually look to the relevancy piece, and you can't look to the very thing that 702 requires. Because Rule 702 is not limited simply to methodology. Rule 702 requires that it must assist the trier of fact, which I would think of as a relevance piece. Also, expert testimony to be admitted under 702 has to be the product of reliable principles and methods. So even before Daubert, Congress said that the principles have to be reliable as well. Further, Congress says that the expert has to reliably apply the principles and the methods to the facts of the case. Now, it's hard to imagine a case where a scientist could apply a methodology appropriately but reach a conclusion that is at odds with all the published literature. So in a way, it's a little bit about arguing about angels on the head of a pen or something. But the analysis that the court is assigned to engage in is not limited in some abstract way to the methodology. It does look at whether the outcome, whether the opinion, is supported in the medical and scientific literature. But in terms of the methodology, then, is it your view that it's unreliable or that it's irrelevant or that it's both? Early pregnancy outcomes are irrelevant to the Conric case. We know this fetus had some profound medical problems long before Ms. Conric ever stepped foot at the Chalmette Refinery. Microcephaly, a cleft palate, which in and of itself is not profound necessarily, but this mandibular synthesis that the jaw didn't meet, there were some profound problems that have nothing to do with Chalmette Refinery. Which predated the date she started working. Exactly, Judge, exactly. So early pregnancy outcomes for a person who only came to work there 23rd or 24th week are not relevant. And under that ground, they're also not specific. You'll recall from the Arkema case, you'll recall from Knight, where Barry Levy was struck as an expert, specificity is a requirement here. One can't simply say because A causes one type of cancer, therefore A causes every cancer. So the specificity here is lacking as well. This is a little bit of a tangent, and frankly, I have the same concern that the Court noted before. Most of the reply brief that we saw from the other side really gets into specific causation concepts. The Pipitone case is clearly a specific causation case. It's one where the Court notes twice in the opinion that the parties agree that if this unsanitary needle that was injecting chicken parts for some reason into somebody's knee, right, and gave someone a salmonella infection, that if, in fact, it was contaminated, then yes, it would cause that infection. So general causation wasn't an issue. Similarly, the Curtis case, which they cite in their written product, the Curtis case is one where the Court tells us that the defendants don't seriously challenge general causation, and it was one where benzene caused some short-term dizziness, nausea, vomiting, those sorts of things. So the differential diagnosis is a specific causation methodology. Absolutely. If you can accept that A causes B, then you get to the question of, well, let's see, did A cause B? Exactly, or maybe something else did, et cetera, et cetera. So we don't really even get there here, although at the same time I'm a little bit troubled. For example, if now the appellant is trying to rely on the autopsy to say that that somehow satisfies Daubert, A, I don't think it does. But B, I think, again, let's get to the specifics of what the autopsy even tells us. The autopsy notes in a summary and interpretation that effects of benzene exposure in pregnant women is not well understood. And then when the autopsy gives a cause or etiology on page 431 of the record, the etiology is suspect decreased utero-placental blood flow. So I think it's a little bit inaccurate to suggest to this Court that the autopsy, which says the causes of benzene crossing the placenta are not well known, that the autopsy somehow would satisfy the plaintiff's burden to show reliable and relevant expert testimony. There's no clear error here. Judge Vance went through an exhaustive analysis. She identified the methodological mistakes that Dr. Harrison made. I will suggest to the Court that as to Dr. Waters, Judge Vance first found that the plaintiffs had waived any complaint about Dr. Waters because they didn't respond to the defendant's motion to strike. But then she went ahead and addressed it, and essentially Waters' function is not much more than kind of a me-too of the same core of opinions. So what we're left with here is a thorough analysis, a thorough walkthrough of exactly what the Knight case indicates, general causation first and then specific causation. In fact, I think Knight even calls it a two-step. And under that general causation analysis, Judge Vance certainly shows her work, shows the methodological flaws, points out that there really is a true analytical gap that Harrison would ask the Court to make too great a leap, which is just what the Supreme Court disapproved of in Joyner, just what this Court disapproved of in the Arkema case and in others. The analytical gap to say, I can accept that this substance can cause one thing and therefore it causes another. Well, Dr. Harrison doesn't even show his work about how he makes that leap. And in the absence of Dawbert's sufficient evidence, which, by the way, Dr. Harrison was given every opportunity to provide, plaintiffs were given every opportunity to provide, the District Court fulfilled its function in finding as it did. And it fulfilled its function in such a way that it actually facilitates this Court's review. Let me ask you one thing that's totally different, which is this whole issue of Chalmette's citizenship. You responded to our request for supplemental briefing by explaining the citizenship. Was that citizenship also the same at the time of filing? Absolutely. Absolutely. Judge, that's exactly the question. Wouldn't it be appropriate for you to file a motion under Section 1653 to supplement the record with some kind of proof of this information to avoid the need to send it back for any kind of findings? The defense would be happy to do so, Judge. I guess here's exactly the question we had to look at when we got the notice from the Court. At the first instance, if that had been contained in our pleading, that is, it wouldn't have to be some sort of articles of incorporation or other proof or whatever else. The presence of that in the pleading, I think, would have ended the inquiry. But you still need some kind of motion to amend the pleadings, to do something. You're sitting here in the appellate court and bringing up new stuff that we asked you for. But somehow that's got to be done correctly. So it would seem like you need to be doing something along those lines. We are happy to. Frankly, I'm not trying to make excuses to the Court, but this came up in the last 10 days or whatever it would be. Subject matter jurisdiction is always important. Absolutely. But taking further steps than answering the Court's question is just something we hadn't done. But now they just assume the federal courts not have jurisdiction, given how it went for them. So you might be the one who wants to make sure that's clear. Message received, Judge. At this point, unless the Court has additional questions for the appellee, we'd like to give back the reserve. Mr. Bifad, we'll hear from Mr. Patton now. Thank you, Your Honor. To pick up back on the citizenship question, Judge Haynes, very briefly, Mobile Oil Corporation, based on our research, does not exist as a subsidiary of Exxon. That's why we raised the question that we had as to what the full citizenship of this LLC was. Judge Graves, to come back to a point that you picked up on, the differentiation between the cleft palate. Cleft palate, those abnormalities usually occur early on in pregnancy. The thoroughness, the methodology of our experts was to look at all the disorders here in question. And the fetal death that we are focusing on is, indeed, the death of this fetus. The nomenclature here is worth reminding the Court. A miscarriage is a death before 20 weeks. The medical term for that is spontaneous abortion. After 20 weeks, it's generally called a stillbirth. But what came out through all the expert testimony in this case is that sometimes that nomenclature gets mixed up a little bit. Sometimes it's not followed completely or consistently. The leap that we were challenged by and that Mr. Butto pointed out, Harrison's problematic leap, if you will, is applying literature from one trimester to another. And the literature that we cite, there can be no question that it repeatedly shows organic solvents and including specifically benzene, above doubling of the risk and statistically significant. The fact that this woman was exposed, and to your point, Judge Haynes, whether or not women are working in United States refineries as pregnant or whether we can go to the middle of the mall and pick the perfect study to match the facts here, we have picked all of the studies that apply. And there's no challenge by the district court that we did not. Those studies do, in fact, show the increased risk. They show it. The ZOO study, XU in particular, goes through over 3,000 women who worked at petrochemical plants facilities in China. The literature is contained in our brief throughout pages 21 to 26. This was one of the earlier questions posed to me. Where do I respond in the briefing to the criticisms of Dr. Harrison? Page 21 through 26. It's consistent. We point out the results. Daubert. This is a Daubert case. I suspect that when you went through the list of what we have today, you have a False Claims Act case, and then you had the police case. Well, we've got a Daubert case here today. Let's go back to Daubert. Daubert asks whether the theory or technique the expert employs is generally accepted, reviewing the methodology. There's no challenge that it's not. Whether the theory has been subjected to peer review and publication. That's what the analysis here is all about, the publications which all have been peer reviewed. Again, specifically, as I'm ticking down on the time, I'd remind this Court that Dr. Barrett's book chapter is about 15 pages. It contains 117 references and is also very specific in certain sections to this. Whether the theory can and has been tested, again, we don't have that here. We have epidemiological studies. Potential rate of error, that's covered in the statistical significant aspect. And whether there are standards controlling the technique's operation. The technique should be, once you get past the fact that these are good scientists applying professional judgment, the technique should be cross-examination on the stand. Presentation of contrary evidence. Under that analysis, you would never have a gatekeeping function. Because you typically are going to find problems with an expert by cross-examination, and that's how the defendant's going to, or the opposing party's going to bring them up. And you're going to say, well, it was discovered through cross-examination, and therefore it has nothing to do with methodology. And to me, that's a big one to swallow, I think. I don't see anywhere in this record where there's a specific criticism of Dr. Harrison for failing to apply normal epidemiological principles. He says in his own report, and it's contained in the record, that he follows Bradford Hill. He points out these aspects, and the defendant challenges him. Throughout the brief, Judge Vance's opinion mirrors precisely, almost word for word, numerous sections of the cross-examination. That is not what's out there. That's how facts are usually obtained. I mean, in other words, we take depositions. I take a deposition, you take a deposition, so on, whatever, and that's how facts are obtained. And so then the judge looks at the facts that were obtained, and you say if it was obtained through cross-examination by defense counsel, it doesn't count. It doesn't make any sense to me. You're going to do a direct, and that's also going to count, in helping the judge determine whether this expert can pass the gatekeeping, the gate. The methodology was to review the epidemiological studies and give opinions. We've done that throughout the case, and it's in the record. Anything else should be left to cross-examination. That's where the judge committed the error. That's where the judge overstepped her function. Rule 702, as I wrap up, is a rule of admissibility rather than exclusion. There is no aspect of Daubert that goes to the ultimate question. And finally, as this Court has repeatedly stated, questions related to the basis and sources of an expert's opinions affect the weight of that opinion to be considered by the jury. Thank you, Your Honors, for your attention to our case. Thank you, sir. That concludes the cases we have on the oral argument case today.